# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs June 30, 2014

## IN RE AIREONA H. W.[1]

**Appeal from the Juvenile Court for Hamilton County**
**No. 254987     Hon. Robert D. Philyaw, Judge**

---

**No. E2014-00241-COA-R3-PT-FILED-AUGUST 20, 2014**

---

This is a termination of parental rights case in which the Tennessee Department of Children's Services filed a petition to terminate Mother's parental rights to the Child. The trial court found that clear and convincing evidence existed to support the termination of Mother's parental rights on several statutory grounds and that termination of her rights was in the Child's best interest. Mother appeals. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and THOMAS R. FRIERSON, II, J., joined.

Berry Foster, Chattanooga, Tennessee, for the appellant, Amber W.

Robert E. Cooper, Jr., Attorney General and Reporter, and Ryan L. McGehee, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee, Department of Children's Services.

John B. Wysong, Chattanooga, Tennessee, guardian ad litem for the minor, Aireona H. W.

---

[1]This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

**OPINION**

## I. BACKGROUND

Aireona H. W. ("the Child") was born to Amber W. ("Mother") and Eugene B. ("Father") in March 2011. The Child tested positive for illegal substances at birth. The Tennessee Department of Children's Services ("DCS") provided services to Mother to address the issue of drugs and domestic violence. Shortly thereafter, Mother moved to Georgia, causing DCS to close the case. A few months later, DCS received a second referral regarding Mother's care of the Child. DCS closed the case because Mother could not be located. A few months later, DCS received a third referral regarding Mother's care of the Child. DCS eventually located Mother, who had several active warrants for her arrest in Hamilton County, and removed the Child in March 2012. The Child was adjudicated as dependent and neglected, based upon Mother's use of illegal drugs while pregnant with and while parenting the Child and her inability to provide a safe and stable home.

The record reflects that DCS developed a permanency plan on April 16, 2012, and another on February 21, 2013. These plans were ratified by the trial court. Pursuant to the plans, Mother was required to complete an alcohol and drug assessment and follow all recommendations, comply with random drug screening, comply with mental health counseling, remit child support, visit the Child, attend parenting classes, resolve all legal issues, and obtain and maintain housing, employment, and transportation. DCS filed a petition to terminate Mother and Father's parental rights to the Child in April 2013.[2] DCS alleged that termination of Mother's parental rights was supported by the statutory grounds of abandonment for failure to visit, substantial noncompliance with the permanency plans, and the persistence of conditions which led to removal.

A hearing was held at which several witnesses testified. Mother, who was in custody at the time of trial, stated that in addition to the Child, she had four other children who no longer lived with her. She testified that when the Child was removed, she tested positive for marijuana and was arrested based upon an outstanding warrant. She was released in June 2012 but was currently incarcerated for failure to pay child support for one of the Child's siblings. She hoped to be released in "the next few weeks" because she believed her arrest was a mistake when her child support payments were automatically deducted from her paycheck. She stated that prior to her current incarceration, she worked at Subway and offered her assistance to an "elderly lady" on a regular basis in return for payment. She claimed that upon her release, she had a place to live with her roommate, Ashley C.

---

[2]Father failed to legitimate the Child and never established a relationship with the Child. He did not appear at the termination hearing at which his rights were terminated. He is not a party to this appeal.

Mother testified that she had completed her parenting classes, had remained drug free, had maintained employment, and had visited the Child pursuant to the permanency plans. She acknowledged that she completed her parenting class in June 2013, two months after the termination petition had been filed. She asserted that her case manager merely gave her a listing of parenting classes in the area. She explained that the list was approximately four years old and that half of the places listed no longer offered classes. She conceded that she had tested positive for marijuana on several occasions since the Child had been removed. She denied using marijuana and claimed that the tests were faulty.

Mother testified that she always provided DCS with a current address. She asserted that from June 2012 through May 2013, DCS only came to her residence on one occasion. She explained that she was not present for that visit because she did not know a visit had been scheduled. She asserted that DCS never assisted her in finding employment. She acknowledged that she was unemployed from March 2012 until December 2012. She explained that she was in custody until June 2012 and that she gave birth to her fifth child in August 2012. She asserted that once she found employment in December 2012, she maintained her position until she tore her rotator cuff six weeks later. After recovering from that injury, she was hired by Subway in March 2013 and maintained her employment until her current arrest for failure to pay child support. She believed that she could return to work at Subway once she was released and that at the very least, she had employment as a caretaker for her friend's mother, the aforementioned "elderly lady."

Mother acknowledged that she was currently unable to parent the Child and that she missed some visitation time with the Child. She explained that she had transportation issues and was incarcerated or hospitalized on several different occasions throughout the Child's placement with DCS. She claimed that she asked DCS for assistance with transportation but that she did not receive help until January 2013, when she was finally given a bus pass. She asserted that despite her inability to maintain visitation, she enjoyed a "wonderful bond" with the Child, who often expressed a desire to come home with her. She conceded that the Child had trouble adjusting to her visitations at first.

Lisca Gaffney testified that she worked for DCS and that she was assigned to Mother's case in September 2012. She claimed that Mother failed to maintain contact with her and that Mother also failed to maintain regular visitation with the Child. She recalled that Mother often blamed her failure to visit on her health, transportation, or lack of housing. She offered several bus passes and ultimately provided one bus pass to assist Mother in maintaining visitation, but Mother still failed to maintain regular visitation. She recalled observing the Child's visitation with Mother and claimed that at first, the Child cried inconsolably and did not want to participate in visitation. She stated that the Child was more amenable to visitation once she included Lindsay B. ("Foster Mother") in the visitations.

-3-

Ms. Gaffney testified that she explained the requirements contained in the permanency plans to Mother. She recalled providing Mother with a list of potential employers and advising Mother concerning several options for completing the parenting classes. She also administered four drug screens to Mother, who failed all four screens. She recalled that Mother tested positive for marijuana on each test and had also tested positive for "benzos, [] methadone, and cocaine" on different occasions. She stated that Mother denied using drugs. She attempted to schedule a retest for Mother but explained that Mother was arrested again before she was able to schedule the test. She acknowledged that Mother attempted to complete an alcohol and drug assessment but that the facility was unable to evaluate Mother. She recalled that the Child was born with drugs, namely marijuana and cocaine, in her system. She related that Mother admitted using cocaine once and claimed that her doctor advised her that marijuana was safe to smoke during pregnancy.

Ms. Gaffney testified that Mother did not provide her with proof of employment until August 2013 and that she had been unable to visit Mother's residence. She recalled that she scheduled one visit for the residence in Ooltewah but that Mother was not present at the appointed time. She related that she came to that residence a second time for an unannounced visit only to find that Mother was not home. She asserted that at times, Mother claimed to not have a residence and was reliant upon friends for a place to stay. She related that Mother recently provided her with a lease between Mother and a friend. She was unable to schedule a home visit because Mother was incarcerated again.

Ms. Gaffney testified that the Child currently resided in a foster home with parents that wished to adopt her. She explained that the Child had lived in the home since her removal from Mother and that the Child was "very bonded" to the family. She acknowledged that Mother had made some progress but explained that Mother's progress occurred in the past few months. She claimed that Mother had not made sufficient progress on the permanency plans that would justify returning the Child to Mother. She related that the Child had been in custody for approximately 18 months and had ultimately found permanency in a stable home with a family that was committed to her.

Foster Mother testified that the Child had resided in her home since March 2012. She believed that the Child had bonded with the family, especially her children. She recalled that the Child was initially reserved when visiting with Mother but that the Child eventually adjusted to the visitations. She denied ever hearing the Child ask Mother to take her home. She acknowledged that she had not supervised the visitations in several months. She claimed that she was willing to adopt the Child and that she already considered the Child as part of her family.

Following the presentation of the above evidence, the trial court terminated Mother's parental rights on the statutory grounds of abandonment for failure to visit, substantial noncompliance with the permanency plans, and the persistence of conditions which led to removal. The court further held that termination of Mother's parental rights was in the best interest of the Child. This timely appeal followed.

## II. ISSUES

We consolidate and restate the issues raised on appeal by Mother as follows:

A. Whether the trial court erred in relying upon the statutory ground of abandonment for failure to visit when it was not added as a requirement in the initial permanency plan.

B. Whether DCS sufficiently established that it made reasonable efforts to reunify Mother with the Child.

C. Whether clear and convincing evidence supports the trial court's finding that termination of Mother's parental rights was in the Child's best interest pursuant to Tennessee Code Annotated section 36-1-113(i).

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

-5-

(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) [t]hat termination of the parent's or guardian's rights is in the best interest [] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2010, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn. 2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36-1-113, the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim. *State Dep't of Children's Servs. v. Mims*, 285 S.W.3d [435,] 447-48 [(Tenn. Ct. App. 2008)]; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004).

> Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010).

## IV. DISCUSSION

### A.

Although not raised as a separate issue, Mother asserts that the trial court erred in relying upon the statutory ground of abandonment for failure to visit because it was not added as a requirement in the initial permanency plan. She acknowledges that visitation was included as a requirement in the second plan but notes that the second plan was not ratified until April 10, 2013, six days prior to the filing of the termination petition. DCS responds that it promptly scheduled visitation once Mother was released from incarceration but that Mother failed to regularly visit the Child.

Abandonment for failure to visit is a statutory ground of termination that may be applied regardless of whether a permanency plan is ever created to assist a parent in reuniting with his or her child. *See generally* Tenn. Code Ann. § 36-1-102(1)(A)(i). Indeed, for the purposes of termination proceedings, abandonment means that:

> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i). A parent's willful failure to visit the child "means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). Token visitation is defined as "visitation, under the circumstances of the individual case, [that] constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C).

In this case, Mother does not contend that she maintained regular visitation with the Child. Mother was incarcerated when the initial permanency plan was created. Once Mother was released, DCS scheduled visitation with Mother, who only engaged in token visitation with the Child. Accordingly, we conclude that clear and convincing evidence supported this statutory ground of termination. Mother does not challenge the trial court's ruling concerning the remaining statutory grounds for termination, namely substantial noncompliance with the permanency plans and the persistence of conditions which led to removal. In the event of further appellate review, we have reviewed the evidence supporting each ground of termination and found clear and convincing evidence supporting each ground.

B.

Mother claims that DCS failed to assist her in her efforts to reunite with the Child. She asserts that DCS merely provided her with a list of service providers in its effort to assist her in completing her alcohol and drug assessment and her parenting classes. She also argues that DCS failed to assist her in her efforts to obtain and maintain employment, failed to maintain contact with her, failed to inspect her residence to ensure that it was suitable for visitation with the Child, failed to assist her in her efforts to visit the Child, and failed to honor her request for retesting following her failure of the drug screens. DCS responds that it made reasonable efforts to assist Mother but that Mother "made no effort whatsoever to complete even the initial step of having an alcohol and drug assessment, has failed every drug screen, denies using illegal drugs and failed to maintain contact."

Once a child has been removed from a parent's home, DCS is tasked with making it possible for the child to return home before instituting termination proceedings. Tenn. Code Ann. § 37-1-166(a)(2). At the termination proceeding, DCS must prove by clear and convincing evidence that reasonable efforts were made to reunite the child with the parent. Tenn. Code Ann. § 37-1-166(b). For purposes of DCS's involvement, the term reasonable efforts refers to "the exercise of reasonable care and diligence by [DCS] to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). "The reasonableness of [DCS's] efforts depends upon the circumstances of the particular case." *In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006).

"While [DCS's] reunification efforts need not be "herculean," DCS must do more than simply provide the parents with a list of services and send them on their way." *Id.* "[DCS] employees must use their superior insight and training to assist the parents in addressing and completing the tasks identified in the permanency plan." *Id.* These "employees have an affirmative duty to utilize their education and training to assist parents in a reasonable way to address the conditions that led to the child's removal and to complete the tasks stated in the plan." *In re R.L.F.*, 278 S.W.3d 305, 316 (Tenn. Ct. App. 2008). In

keeping with this ideal, DCS must provide an affidavit, identifying its reasonable efforts, for the court's consideration. Tenn. Code Ann. § 37-1-166(c); *see In re R.L.F.*, 278 S.W.3d at 317. However, "'[r]eunification of a family is a two-way street, and the law does not require [DCS] to carry the entire burden of this goal." *State Dep't. of Children's Servs. v. S.M.D.*, 200 S.W.3d 184, 198 (Tenn. Ct. App. 2006) (quoting *In re R.C.V.*, No. W2001-02102-COA-R3-JV, 2002 WL 31730899, at *11 (Tenn. Ct. App. Nov. 18, 2002)). "Thus, parents desiring the return of their children must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required [DCS] to remove their children from their custody." *In re Giorgianna H.*, 205 S.W.3d at 519.

In determining whether the efforts used by DCS were reasonable, the court should consider DCS's affidavit and the following factors:

(1) the reasons for separating the parent from his or her children,

(2) the parent's physical and mental abilities,

(3) the resources available to the parent,

(4) the parent's efforts to remedy the conditions that required the removal of the children,

(5) the resources available to [DCS],

(6) the duration and extent of the parent's remedial efforts,

(7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and [DCS's] efforts.

*In re Giorgianna H.*, 205 S.W.3d at 519.

The permanency plans at issue in this case were not particularly lengthy or hard to follow. Ms. Gaffney advised Mother on the steps she needed to take to reunite with the Child. When Mother was not incarcerated, DCS provided Mother with opportunities for visitation, a bus pass, an alcohol and drug assessment, drug screens, and a list of potential employers in the area. Mother was sporadic in her visitation efforts, was unable to complete the assessment, and failed every drug screen she was given. Ms. Gaffney testified that she advised Mother concerning several options for completing the parenting classes. Yet, Mother failed to fulfill this requirement until well after the termination petition was filed. Ms. Gaffney attempted to visit one of Mother's several residences throughout her

involvement with DCS. However, Mother was not present for the scheduled appointment. We believe that Ms. Gaffney attempted to assist Mother and explained the steps of the permanency plans but that Mother simply failed to put forth any effort to comply with the most important requirements that would have allowed her to reunite with the Child, namely to remain drug free and provide a stable home for the Child. Accordingly, we conclude that the record contains clear and convincing evidence that DCS made reasonable efforts to assist Mother in her attempts to reunite with the Children.

C.

Having concluded that there was clear and convincing evidence supporting the statutory grounds to terminate Mother's parental rights and that DCS made reasonable efforts to assist Mother in reuniting with the Child, we must consider whether termination of Mother's rights was in the best interest of the Child. In making this determination, we are guided by the following non-exhaustive list of factors:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological

abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

A number of the best interest factors weigh against Mother. She had not made the adjustment of circumstances necessary to provide a stable home for the Child as evidenced by her incarceration at the time of the hearing. Tenn. Code Ann. § 36-1-113(i)(1), (2). She failed to maintain regular visitation with the Child. Tenn. Code Ann. § 36-1-113(i)(3). The Child resides in a safe and stable foster home that expressed a desire to adopt her. Tenn. Code Ann. § 36-1-113(i)(5). Questions remain as to whether Mother can provide a safe and stable home free from drug abuse. Tenn. Code Ann. § 36-1-113(i)(7). We acknowledge that Mother obviously cared for the Child. However, her inability to accept responsibility for her actions place doubt upon her ability to effectively parent the Child in the near future. The Child needs permanency and stability, which she can receive from the foster parents who have successfully parented her while Mother allowed the Child to languish in custody. With all of the above considerations in mind, we conclude that there was clear and convincing evidence to establish that termination of Mother's parental rights was in the best interest of the Child. Accordingly, we affirm the decision of the trial court.

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary.  Costs of the appeal are taxed to the appellant, Amber W.


_____
JOHN W. McCLARTY, JUDGE